UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

EARL DEMETRIUS DAVIS,

          Plaintiff,

v.

MICHAEL BROWN et al.,

          Defendants.

_____/

Case No. 2:21-cv-171

Honorable Maarten Vermaat

## <u>OPINION</u>

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 5.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e) and 1915A(b) and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litigation Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendant(s) is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding

tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) (stating that "[p]ursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way that they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a

consent from the defendants[; h]owever, because they had not been served, they were not parties to the action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.    Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan. The events about which he complains occurred at that facility. Plaintiff has been incarcerated for virtually all of his adult life. His "earliest release date"—the date he will first become eligible for parole—is April 15, 2052. *See* MDOC Offender Tracking Information System (OTIS) https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=222490 (last visited Sept. 13, 2022).

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis*., 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros*.); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

Plaintiff's allegations center on the COVID-19 pandemic. His allegations track back to December 1, 2019, when the Center for Disease Control and Prevention (CDC) and other organizations "discovered" the COVID-19 virus. Plaintiff sues Michigan Governor Gretchen Whitmer and the Director of the State Department of Health Services Joneigh Khalidun; MDOC Director Heidi Washington, MDOC Deputy Director Kenneth McKee, MDOC Director of Health Care Services Marti Kay Sherry, and MDOC Director of Legal Affairs/Grievance Coordinator Richard Russell; KCF Warden Michael Brown, KCF Deputy Warden Bruce Biggers, and KCF Grievance Coordinator Melissa Gustafson; MDOC Health Care Contractor Corizon Healthcare, Inc. (Corizon) and Corizon's Chief Executive Officer Kathy Witty; Contracted KCF/Corizon Physician Timothy Stallman; MDOC Food and Hygiene Vendors Keefe Group, Inc. and its subsidiary Access Securpak, Inc. (Access); NxGen MDX, Inc. (NEXT-GEN); NEXT-GEN's Lab Proofer Jacqueline Peacock; and Curative Labs, Inc. and its Chief Executive Officer Carmen McIntyre.[2]

Plaintiff provides a history of the first few months of the pandemic and its impact on prisons generally and Michigan prisons specifically. He relies on affidavits and news reports that relate to other cases. Plaintiff alleges that the entire group of Defendants or subgroups of Defendants took initial actions in response to the pandemic. For example, Plaintiff alleges:

> ¶ 25. Disturbingly, in  EXHIBIT D GRETCHEN, KHALIDUN, WASHINGTON, MCKEE, SHERRY, CORIZON and WITTY sent PLAINTIFF (all) an email falsely stating They were: "leading the nation when it comes to consistent testing",

_____

[2] Although Plaintiff alleges that Defendant McIntyre is CEO of Curative Labs, it appears she is actually serving as the Chief Medical Officer of the MDOC. *See, e.g.*, https://www.med.wayne. edu/profile/ds9051 (last visited Sept. 13, 2022). Plaintiff's allegation regarding Defendant McIntyre's connection to his case apparently follows from the listing of McIntyre as "Physician" on the COVID-19 test results from Curative Labs. (ECF No. 1-10, PageID.65; ECF No. 1-11, PageID.67.) It is not entirely clear whether Plaintiff is interested in naming Carmen McIntyre as a defendant or the chief executive officer of Curative Labs as a defendant. The Court will address both possibilities.

outrageously only when "symptoms" arise, which was when COVID-19 was reeking [sic] havoc for deaths.

¶ 30. As a result of not testing, WASHINGTON, MCKEE, BROWN AND SHERRY intentionally deceived PLAINTIFF even after 3 known deaths, when BROWN had been secretly allowing [angry] resistant an[d] knowingly ill staff to enter with only temperatures checked . . . .

¶ 33. . . . DEFENDANTS [issued] "homemade masks" . . . with KHALIDUN, WASHINGTON, MCKEE, SHERRY, CORIZON and WITTY agreeing . . . even when Dr. Rick Bright of BARDA had "500 million N95" available for PLAINTIFF.

¶ 48. . . . BROWN an[d] the DEFENDANTS can maintain communilizing [sic] to inflict Plaintiff with COVID-19 under Their "version" of a "Herd Immunity" strat[eg]y without testing and treatments for irreparable harm and inevitable death.

¶ 51. The DEFENDANTS in ¶ 44 [WASHINGTON, MCKEE, SHERRY, CORIZON, WITTY, NEXT-GEN, STALLMAN and PEACOCK] . . . avoided the effective an[d] more costly "Serology Test" which ca[ll]ed for using a "tea spoon" of PLAINTIFF'S "saliva" or direct "blood" for an accuracy of "99.8%" versus the nasal [swab's] "20%" falsity to cause "deaths."

(Compl., ECF No. 1, PageID.10–15 (capitalization in original).)

Plaintiff then leaps ahead from the Defendants' general response to the pandemic during the spring of 2020 to the specific events that occurred at KCF during October and November of 2020. Plaintiff points to two events at the end of October that he suggests brought the virus into KCF: (1) the school principal was visibly ill yet continued to be permitted into the facility; and (2) COVID-positive prisoners were transferred from the Marquette Branch Prison to KCF.

Plaintiff alleges that he was tested for COVID-19 infection on November 16, 2020, and two days later the negative test result was released. Then, Plaintiff and 80 other prisoners were moved to the gym area. (Compl., ECF No. 1, PageID.17–18.) Plaintiff contends that area had been previously occupied by COVID-19 positive prisoners and that the port-a-potty toilets located there had not been emptied before Plaintiff's group was moved into the gym. Plaintiff posits that he was infected with the COVID-19 virus by splashing from the toilets. After some time in the gym, the next week, Plaintiff tested positive for COVID-19 infection.

5

Based on the alleged facts, Plaintiff raises eleven claims for relief. In <u>Count I</u>, Plaintiff alleges that Defendant Whitmer, Khalidun, Washington, McKee, Brown, Sherry, Russell, and Stallman have violated state constitutional provisions. In <u>Count II</u>, Plaintiff alleges that Defendants Whitmer, Khalidun, Washington, McKee, Brown, Sherry, and Stallman violated Michigan statutes and that Defendants Corizon, Witty, Stallman, McIntyre, and Peacock acted arbitrarily in following "protective PD's," which the Court interprets to mean policy directives. In <u>Count III</u>, Plaintiff sues the same Defendants that he references in Court II for violating state statutes and federal regulations regarding disclosure of medical records. In <u>Count IV</u>, Plaintiff alleges that Defendants Corizon, Witty, NEXT-GEN, Peacock, Curative, McIntyre, Whitmer, Khalidun, Washington, McKee, Brown, Sherry, Russell, and Stallman violated state health care laws and released confidential information in violation of state law. In <u>Count V</u>, Plaintiff alleges that Defendants Whitmer, Khalidun, Washington, McKee, Brown, Sherry, Stallman, and Russell breached state law duties when they ordered others to illegally obtain and possess Plaintiff's DNA and genetic information and health records. Additionally, Plaintiff alleges that Defendants NEXT-GEN, Peacock, Curative, and McInyre were allowed to "'experiment' by tampering for permanent use of DNA and Genetic information in infamy" also, apparently, in violation of state statutes. (*Id.*, PageID.24.) In <u>Count VI</u>, Plaintiff alleges that Defendant Keefe and Access, with all Defendants, in violation of HIPAA and state and federal statutes, illegally profited from Plaintiff's health. In <u>Count VII</u>, Plaintiff alleges that, in violation of HIPAA and state and federal statutes, all Defendants breached duties when they abused Plaintiff's emergency funds through federal Medicaid. In <u>Count VIII</u>, Plaintiff alleges that, in violation of HIPAA and state and federal statutes, Defendants breached duties when they deliberately fabricated Plaintiff's health documents and records. In <u>Count IX</u>, Plaintiff alleges that, in violation of state statutes and an MDOC policy

directive, Defendants "breached duties when [they] 'knowingly' discriminated, that caused actual injuries, to result in Plaintiff['s] death." (*Id.*, PageID.25.) In <u>Count X</u>, Plaintiff alleges that Defendants, in violation of several state statutes, breached duties and deliberately and knowingly harmed Plaintiff irreparably. Finally, in <u>Count XI</u>, Plaintiff alleges that the Defendants conspired for illegal purposes against Plaintiff.

Plaintiff alleges that he suffers ongoing health consequences because of Defendants' conduct and asks the Court to enter judgment against Defendants in an amount exceeding $200,000,000.00.

## II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71

(6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

## III.     Federal constitutional violations

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff's "Counts" do not specifically mention his federal constitutional rights, nor do they mention 42 U.S.C. § 1983. In the first paragraph of his typewritten complaint, however, Plaintiff mentions § 1983 and claims that he has filed suit to remedy deprivations of rights secured by the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. The Court will construe Plaintiff's allegations liberally to determine whether he has adequately stated the federal constitutional claims he identifies in a conclusory fashion in the preface to his complaint.

### A.     Under color of state law

In order for a private party's conduct to be under color of state law, it must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982); *Street*, 102 F.3d at 814. There must be "a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Where the defendants are not state officials, their conduct will be deemed to constitute state action only if it meets one of three narrow tests. The first is the symbiotic relationship test, or nexus test, in which the inquiry focuses on whether "the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jackson*, 419 U.S. at 357–58. Second, the state compulsion test describes situations "in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *NBC v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1026 (11th Cir. 1988); *accord Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970). Finally, the public function test covers private actors performing functions "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353; *accord West*, 487 U.S. at 49–50. *See generally, Lugar*, 457 U.S. at 936–39 (discussing three tests).

### 1.     Vendors

Plaintiff has named several defendants that are not traditional "state actors." For example, Plaintiff names MDOC vendor Keefe and its alleged subsidiary Access.[3] The Sixth Circuit has concluded that entities such as Keefe and Access, as vendors selling products to prisoners, are not acting under color of state law. *See Bomer v. Access Catalog Co.*, 75 F. App'x 382 (6th Cir. 2003) ("As a vendor selling products to prisoners in the custody of the Michigan Department of Corrections, Access was not acting under color of state law and was not liable to [plaintiff] under 42 U.S.C. § 1983." (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155–57 (1978); *Brock v.*

---

[3] Access appears to be an "affiliate" of Keefe Group. Keefe Group has several affiliates "Keefe Commissary Network, Access Securepak, Access Corrections, ICSolutions and Advanced Technologies Group." *See* https://www.keefegroup.com/ (last visited Sept. 13, 2022). Keefe Group describes itself as "the leading supplier of food products, personal care products, electronics, clothing, technology, telecommunications and software solutions correctional facilities across the nation." *Id*. Plaintiff's description of Keefe and Access as "vendors" to the MDOC, therefore, appears to be accurate.

*McWherter*, 94 F.3d 242, 244 (6th Cir.1996))); *see also Kyles v. Keefe Commissary Network, LLC*, No. 14-CV-11907, 2015 WL 1637466, at *6 (E.D. Mich. Apr. 13, 2015) ("[N]umerous federal courts have found that corporations involved in [supplying products to a department of corrections or selling products directly to prisoners] did not act under color of state law.") (collecting cases). Accordingly, Plaintiff has failed to state a claim under § 1983 against Keefe or Access.

### 2.    Service providers

Plaintiff also sues NEXT-GEN, NEXT-GEN's Lab Proofer Jacqueline Peacock, Curative Labs, Inc., and its chief executive officer.[4] As best as the Court can discern from Plaintiff's allegations, NEXT-GEN and Curative Labs, Inc. were the labs that processed Plaintiff's COVID-19 tests. There are no facts alleged that support the inference that either of the private companies or their employees or officers were acting under color of state law when they processed Plaintiff's COVID-19 tests or reported the results. It appears that the only other federal court to consider this issue has concluded that a lab processing COVID-19 tests is not a state actor for purposes of § 1983. *See Owens v. President/CEO Mako Medical Labs*, No. 5:21-CV-364-D, 2021 WL 5412272 (E.D. N.C. Oct. 20, 2021) *R. & R. adopted*, 2021 WL 5495782 (Nov. 18, 2021). There are no facts alleged that suggest that the labs or their employees or officers satisfy any of the three tests. Accordingly, Plaintiff's allegations fail to state that NEXT-GEN, Peacock, Curative Labs, Inc. or Curative's CEO are state actors; and, therefore, fail to state a § 1983 claim.

### B.    Corizon Healthcare, Inc.

Corizon is also a private entity. However, "[a]s a private entity contracted to perform the traditional state function of prison medical care, Corizon may be sued for constitutional

---

[4] *See supra* note 2.

violations." *Baker v. Stevenson*, 605 F. App'x 514, 520 (6th Cir. 2015) (citing *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)).

Although Corizon may be sued under § 1983, as a private corporate entity, it stands in the same position as a public municipal entity. A local government such as a municipality or county "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a municipality may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35–37 (2010) (citing *Monell*, 436 U.S. at 694). The requirements for a valid § 1983 claim against a municipality apply equally to private corporations that are deemed state actors for purposes of § 1983. *See Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) (recognizing that the holding in *Monell* has been extended to private corporations); *Street*, 102 F.3d at 817–18 (same).

Plaintiff must allege that his injury was caused by the custom or policy of Corizon. He does not. Plaintiff throws Corizon in when he cites particular groups of Defendants taking one action or another, but he never states that Corizon had a custom or policy that caused his injury. Accordingly, Plaintiff has failed to state a claim against Corizon.

### C.    First Amendment

Plaintiff states the words "First Amendment" in the first paragraph of his typewritten complaint. Thereafter, he does not mention the amendment or any rights protected by the amendment—free exercise of religion, free speech, freedom of the press, freedom to assemble, or freedom to petition the government for redress of grievances. In the paragraphs regarding exhaustion, he does note that the administrative grievance regarding his COVID-19 infection was rejected. (Compl., ECF No. 1, PageID.7.) Plaintiff states: "WASHINGTON Order[e]d RUSSELL

11

and GUSTAFSON to 'Reject" PLAINTIFF'S grievance (later) contrary to PD 03.02.130." (*Id.* (capitalization in original).)

Plaintiff's allegation does not suffice to state a claim for violation of First Amendment rights. Plaintiff's right to petition government is not violated by Defendants' alleged failure to process or act on Plaintiff's grievance. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond). The Court concludes that Plaintiff has failed to state a claim against any Defendant for violation of his First Amendment rights.

### D.    Fifth or Fourteenth Amendments

Plaintiff does not indicate what clause of the Fifth or Fourteenth Amendments he relies upon to support his claims. In Count II, he mentions the words "due process." (Compl., ECF No. 1, PageID.22.) The Court concludes, therefore, that it is Plaintiff's intent to raise due process claims under the Fifth and Fourteenth Amendment.

The Due Process Clauses contemplate two distinct protections: procedural due process and substantive due process. The elements of a procedural due process claim are (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)). But the deprivation of a liberty or property interest is only a violation when it is accomplished without adequate process.

It may be possible to liberally construe Plaintiff's allegations and characterize some interest as a "liberty interest." The interest discussed in Plaintiff's complaint is the interest in being confined under conditions that do not pose a serious risk to a prisoner's health or safety—the same interest protected by the Eighth Amendment. Whether or not that interest is properly characterized as a "liberty interest," the state is not free to deprive Plaintiff of that interest simply by providing process before the deprivation. Plaintiff's right to be free of purposeful deprivations of safe conditions of confinement is broader than that. The Court concludes, therefore, that the interest that Plaintiff seeks to protect does not fit within the protection afforded by procedural due process.[5]

The second protection afforded by the Due Process Clauses does not depend on process. "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it

---

[5] It is possible that Plaintiff might also argue that certain Defendants' failure to process his grievances interfered with his right to procedural due process. Plaintiff has no due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson*, No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct in connection with Plaintiff's grievance did not deprive him of due process.

'violates the decencies of civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

"Where a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 269 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (discussing that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners). If such an amendment exists, the substantive due process claim is properly dismissed. *Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013).

In this case, there is a specific constitutional amendment that applies to Plaintiff's claims. The Eighth Amendment provides an explicit source of constitutional protection to Plaintiff concerning his right to be free of purposeful deprivation of safe conditions of confinement. *See Graham,* 490 U.S. at 394 (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)) (rejecting a substantive due process claim where the Eighth Amendment supplies a textual source for prison-condition claims); *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (discussing that because the Eighth Amendment supplies the explicit textual source of constitutional protection for claims governing a prisoner's health and safety, the plaintiff's substantive due process claim was subject to dismissal). Accordingly, any claim for violation of Plaintiff's substantive due process rights is properly dismissed as well.

### E. Eighth Amendment

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene

society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The

Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and

wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting

*Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal

civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148

F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations

of essential food, medical care, or sanitation" or "other conditions intolerable for prison

confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant

experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment

within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff contends that Defendants were deliberately indifferent to the risk posed by the

COVID-19 pandemic. In order for a prisoner to prevail on an Eighth Amendment deliberate

indifference claim, he must show that he faced a sufficiently serious risk to his health or safety and

that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus

v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834

(1994)) (applying deliberate indifference standard to medical claims); *see also Helling v.

McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of

confinement claims). The deliberate-indifference standard includes both objective and subjective

components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong,

an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious

harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and

disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually

15

knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1.    Multi-headed "Defendants

In *Boxill v. O'Grady*, 935 F.3d 510 (6th Cir. 2019), the Sixth Circuit Court of Appeals, when analyzing a First Amendment retaliation claim, noted the difficulty posed by conclusory allegations that "Defendants" took one action or another against the plaintiff. The court explained that "[s]ummary reference to a single, five-headed "Defendants" does not support a reasonable inference that each Defendant is liable for retaliation." *Id.* at 518.

Excising out Plaintiff's conclusory allegations that a collective "Defendants," or a more specific list of defendants, took some action or failed to take some action with respect to Plaintiff, eliminates almost the entirety of the complaint. For example, six individual Defendants and Corizon "sent PLAINTIFF . . . an email." (Compl., ECF No. 1, PageID.10.) Five individual Defendants and Corizon agreed that N95 masks should be used as personal protective equipment, but then did not use them despite their availability. (*Id.*, PageID.11–12.) Six individual Defendants, Corizon, and NEXTGEN stated results would be provided in 48 hours, used "the inexpensive an[d] dangerously deceptive 'nasal swab' swipe," and avoided law and policy by giving Plaintiff's confidential DNA and medical information to NEXTGEN. (*Id.*, PageID.PageID.13.) "DEFENDANTS" employed a dangerous "'herd immunity' strategy" (multiple references). "DEFENDANTS" in all of their acts or omissions were all aware that the acts or omissions would cause serious harm and even death. (Compl., ECF No. 1, PageID.18.) There are very few instances where Plaintiff alleges "with particularity facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Boxill*, 935 F.3d at 518 (internal quotation marks omitted) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011)). As in *Boxill*, Plaintiff's summary references to "Defendants" and his listing of groups of defendants as acting

16

together to take a single action does not support a reasonable inference that each Defendant is liable.

### 2.    Respondeat superior

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S. at 691; *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. In many instances, except as to those actions specifically discussed below, Plaintiff has failed to allege that Defendants engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

### 3.    Claims relating to general conditions during the spring/summer of 2020

Setting aside Plaintiff's claims that fail because they are conclusorily directed at groups of Defendants and claims that depend on respondeat superior liability or failures to act following complaint, the remaining Eighth Amendment claims can be separated into two categories: claims that relate to general conditions during the spring and summer of 2020; and claims that relate to the specific events during the fall of 2020.

Claims that relate to the general conditions during the spring/summer of 2020 are premised on Plaintiff's assertion that Defendants did not do enough to protect him from COVID-19 infection. It is noteworthy, however, that whatever actions Defendants took or failed to take, neither Plaintiff nor anyone in Plaintiff's facility apparently was infected with COVID-19 during this time period.

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson*, 961 F.3d at 829. In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

Under that precedent, a medically vulnerable plaintiff may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Plaintiff alleges conditions that could facilitate COVID-19 transmission within KCF, but Plaintiff does not specifically allege that he suffers from conditions that make him medically vulnerable. Nonetheless, at this early stage, the Court concludes that Plaintiff alleges facts sufficient to satisfy the objective prong of the deliberate indifference test.

18

Notwithstanding Plaintiff's ability to satisfy the objective prong, he fails to allege facts sufficient to satisfy the subjective prong of the deliberate indifference test. The Sixth Circuit went on in *Wilson* to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison:

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.
>
> The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff. *Id.* at 42–43.
>
> The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.
>
> Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction,

19

but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic,

> TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard*, 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed

emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

Plaintiff contends that Defendants did not reasonably respond to the COVID-19 threat. His factual allegations regarding this period are contained in ¶¶ 12–63 of the complaint. Plaintiff attaches to his complaint MDOC Director's Office Memorandum (DOM) 2020-30R, effective May 13, 2020, which sets out the steps Defendant Washington directed the MDOC to take in response to the COVID-19 pandemic. (ECF No. 1-5.) DOM 2020-30R requires or permits, *inter alia*, the following:

- prisoners and staff to wear masks at all times unless they are eating or showering
- screening of all individuals entering a correctional facility for signs and symptoms of COVID-19
- social distancing in accordance with CDC guidelines
- isolation areas for prisoners who test positive and "close contacts"
- alcohol-based hand sanitizer for staff
- suspension of visits,
- suspension of transfers without CFA Deputy Director approval
- suspension of classes and programming
- the use of bleach for cell cleaning
- adequate soap for prisoners at all times
- suspension of health care copays for COVID-19 related care
- modification of dining hall seating

(ECF No. 1-5, PageID.46–54.)[6] Plaintiff also attaches to his complaint an MDOC table setting out, facility by facility, the number of prisoners that had been tested, whether the test was positive or negative, the recovery status of positive prisoners, and prisoner deaths. (ECF No. 1-9, PageID.63.) These documents are part of the record.

Plaintiff is not the first prisoner to allege that KCF Defendants failed to protect prisoners from COVID-19 infection. Indeed, prisoner Robert L. Dykes-Bey and 13 other KCF inmates filed a complaint against the MDOC and Defendants Washington, McKee, and Brown, raising the same claims covering the same time period. *Dykes-Bey v. Washington*, No. 2:20-cv-64 (W.D. Mich.). This Court dismissed those plaintiffs' claims on initial screening. Plaintiff Dykes-Bey appealed.

The Sixth Circuit's resolution of that virtually identical claim is instructive. The court affirmed the dismissal:

> Dykes-Bey alleges that the defendants were deliberately indifferent to the serious risk of harm posed by COVID-19. A deliberate-indifference claim under the Eighth Amendment includes both an objective and a subjective prong: (1) the inmate "is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

> As we recognized in *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020), "the objective prong is easily satisfied" in this context. "The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death." *Id.* "The transmissibility of the COVID-19 virus in conjunction with [a prison's] dormitory-style housing—which places inmates within feet of each other—and [an inmate's] health risks, presents a substantial risk that [an inmate] will be infected with COVID-19 and have serious health effects as a result, including, and up to, death." *Id.* The objective prong is met here.

> The subjective prong, on the other hand, generally requires alleging at least that the defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 842). "The official must have a subjective 'state of mind more blameworthy than negligence,' akin to criminal recklessness." *Cameron v. Bouchard*, 815 F. App'x 978, 984 (6th Cir. 2020)

---

[6] The DOM Plaintiff attaches to his complaint is one of a stream of such memoranda. Although the directions were frequently amended, the core requirements and permissions set forth above appear in all of the DOMs for the period covered by Plaintiff's complaint.

(quoting *Farmer*, 511 U.S. at 835). As relevant here, "[t]he key inquiry is whether the [defendants] 'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (quoting *Farmer*, 511 U.S. at 844) (alterations added and omitted). And a response may be reasonable even if "the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted.'" *Id.* at 841 (quoting *Farmer*, 511 U.S. at 844).

Dykes-Bey fails to satisfy the subjective prong. He alleges that the defendants, knowing of the harm posed by COVID-19, acted with deliberate indifference by not providing KCF's inmates with the necessary means to practice social distancing. But Dykes-Bey's complaint does not allege any facts indicating that the defendants were deliberately indifferent to him or any other plaintiff. The complaint does not allege, for example, that KCF had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space. *Cf. Cameron*, 815 F. App'x at 986 (concluding that the plaintiffs failed to produce evidence showing that the defendants let empty prison cells go unused). Nor does it allege that the defendants knowingly housed COVID-19-positive inmates alongside any plaintiff, or even that a COVID-19 outbreak occurred in KCF. Dykes-Bey's allegations about the lack of social distancing, therefore, do not establish deliberate indifference.

Moreover, Dykes-Bey's focus on social distancing ignores the "key inquiry" in these cases—whether the defendants "'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (citation omitted). To that end, Dykes-Bey's own allegations establish that the defendants acted reasonably. The complaint recognizes, for example, that the defendants screened employees daily for COVID-19 symptoms, provided masks to inmates, required correctional officers to wear masks (although some unnamed officers allegedly did not wear them properly), and provided bleach-based disinfectant in every communal bathroom. In other words, Dykes-Bey's complaint acknowledges that the defendants took affirmative steps to mitigate COVID-19's risks. Although he argues that those steps would ultimately be insufficient to stop an outbreak, whether these steps were sufficient matters less than what they say about the defendants' states of mind. *Id.* at 841 (noting that defendants may have responded reasonably even if the "harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted'" (quoting *Farmer*, 551 U.S. at 844)). That is, what matters is whether the precautionary steps taken show that the defendants responded reasonably to the risks of COVID-19. Here, as in *Wilson*, they do. *See, e.g.*, *id.* at 840–41 (finding that similar measures amounted to a reasonable response). In short, these allegations defeat the subjective prong and thus his deliberate indifference claim.

The district court concluded that the defendants were not deliberately indifferent, but it relied on materials outside the record—official sanitation and hygiene policies adopted by the MDOC, reports of confirmed COVID-19 cases at KCF, and an MDOC press release—to reach this conclusion. *See* R. 36, Page ID# 281. Even if its consideration of those materials was improper, we may affirm on any basis supported by the record. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th

Cir. 2002). As stated, Dykes-Bey's own allegations suffice to show that the defendants did not disregard the risks of COVID-19. Therefore, we affirm the district court's judgment on those grounds.

*Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *2–3 (6th Cir. Oct. 14, 2021) (footnote omitted). The reasonableness of the response in Plaintiff's case is even more readily apparent because the "official sanitation and hygiene policies" and the "reports of confirmed COVID-19 cases" that were off-limits in *Dykes-Bey*, are properly considered here because Plaintiff has made them part of his complaint.

Plaintiff identifies a few specific flaws in Defendants' initial response to the COVID-19 threat:

- Defendants Whitmer, Khalidun, Washington, McKee, Sherry, Corizon, and Witty only tested for COVID-19 infection when symptoms arose and they lied claiming that they were "leading the nation when it comes to consistent testing" (Compl., ECF No. 1, PageID.10, ¶ 25)

- on April 10, 2020, Brown passed a rule that staff was required to wear masks (*id.*, PageID.10–11, ¶ 28)

- Brown secretly allowed "angry resistant an[d] knowingly ill staff" to enter with only temperatures checked (*id.*, PageID.11, ¶ 30)

- on April 6, 2020, Brown ordered KCF's air ventilation system turned off (*Ii.*, ¶ 32)

- Khalidun, Washington, McKee, Sherry, Corizon and Witty allowed homemade masks instead of N95 masks even though 500 million N95 masks were available (*id.*, ¶ 33)

- Defendants did not permit Plaintiff to use alcohol-based hand sanitizer (*id.*, PageID.12, ¶¶ 40–41)

- Brown literally painted over surfaces with latex paint leaving dangerous bacteria and germs including COVID-19 dormant (*id.*, PageID.13, ¶ 42)

- Defendants did not test Plaintiff for COVID-19 infection until May 2, 2020 and then used the inexpensive and dangerously deceptive nasal swab test (*id.*, ¶¶ 43–46) rather than the serology test (*id.*, PageID.15, ¶ 55)

- Defendants maintained "communilizing," a "'Herd Immunity' strategy" to infect Plaintiff with COVID-19 (*id.*, PageID.14, ¶ 48)

- Defendants threatened Plaintiff to compel his participation in COVID-19 testing (*id.*, PageID.15, ¶¶ 58–59).

Essentially, therefore, Plaintiff claims that Defendants were deliberately indifferent because they used nasal swab tests—initially for prisoners with symptoms but eventually for all prisoners; required masks; tested staff temperatures before they were allowed to enter the facility; turned off the ventilation system; did not require N95 masks; did not permit prisoners to use alcohol-based sanitizer; and painted surfaces with latex paint.

The Court concludes that these facts do not support the inference that Defendants were deliberately indifferent to the risk of COVID-19 infection. To the contrary, the steps taken by Defendants as alleged by Plaintiff and set forth in DOM 2020-30R were a reasonable response to the risk that defeat the subjective prong of Plaintiff's Eighth Amendment claim regarding the first few months of the pandemic.

In addition, the Court specifically rejects Plaintiff's claims that the use of nasal swab tests, the failure to require and provide N95 masks, and the failure to provide prisoners with alcohol-based sanitizer evidence deliberate indifference.

### a.      nasal swab tests

Plaintiff claims Defendants should have used serology testing rather than nasal swab PCR testing. Plaintiff does not explain how he has come to that conclusion. It is certainly understandable why Defendants may have disagreed with it.

The United States District Court for the Southern District of New York made findings regarding the nasal swab PCR tests in *Aviles v. Blasio*, No. 20 Civ. 9829 (PGG), 2021 WL 796033 (S.D.N.Y. Mar. 2, 2021).[7] The court stated:

---

[7] In *Aviles*, parents of students sought injunctive relief to prevent compelled nasal-swab PCR testing as a condition for in-person education. The Second Circuit Court of Appeals ultimately vacated the district court's denial of a preliminary injunction because subsequent events— abandonment of the condition to in-person education—rendered the matter moot. *Lisa v. Blasio*, No. 21-721, 2022 WL 1216298 (2d Cir. Apr. 21, 2022)

Plaintiffs contend that Defendants should be enjoined from requiring parental consent to random PCR testing because the PCR test is unreliable and cannot reveal whether the subject of the test is currently infectious – *i.e.*, capable of transmitting the COVID-19 virus. (*See* Pltf. Br. (Dkt. No. 12) at 7-8, 17; Lee Decl. (Dkt. No. 12-1) at ¶¶ 17-19; McKernan Decl. (Dkt. No. 12-2) at ¶¶ 14-16; Jan. 14, 2021 Tr. (Dkt. No. 34) at 8)

There is broad consensus in the medical and scientific community that the PCR test is a reliable indicator of the presence of the COVID-19 virus in a subject. (*See, e.g.*, *Using Antigen Tests*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antigen-tests-guidelines.html (last updated Dec. 16, 2020) ("The 'gold standard' for clinical diagnostic detection of SARS-CoV-2 remains NAATs, such as RT-PCR. Thus, it may be necessary to confirm an antigen test result with a nucleic acid amplification test, especially if the result of the antigen test is inconsistent with the clinical context."); Feb. 22, 2021 Def. Ltr., Ex S (Dkt. No. 44-5) at 3, 28 (CDC "Operational Strategy for K-12 Schools through Phased Mitigation" release,which recommends the "prioritiz[ation] [of] tests with highly accurate results with high sensitivity and specificity such as NAATs"); Jan. 23, 2021 Def. Ltr., Ex. H (Dkt. No. 37-17) at 5 (WHO interim guidance from September 11, 2020, "Diagnostic testing for SARS-CoV-2," which states that, "[w]herever possible, suspected active SARS-CoV-2 infections should be tested with NAAT, such as rRT-PCR"); Jan. 23, 2021 Def. Ltr., Ex. I (Dkt. No. 37-18) at 2-4 (FDA overview entitled "A Closer Look at Covid-19 Diagnostic Testing," which notes that molecular tests – such as NAATs – are highly sensitive and highly specific))

The Court concludes that the PCR test is highly accurate in determining the presence of the COVID-19 virus. Indeed, the PCR test is currently the best indicator of COVID-19 infection that is available for mass, routine use. (*Id.*; *see also Test for Current Infection*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/testing/diagnostic-testing.html (last updated Feb. 19, 2021) ("A viral test checks specimens from your nose or your mouth (saliva) to find out if you are currently infected with SARS-CoV-2, the virus that causes COVID-19.... [NAATs] detect the virus's genetic material and are commonly used in laboratories. NAATs are generally more accurate, but sometimes take longer to process than other test types.").

*Aviles*, 2021 WL 796033, at *12. On the other hand, with regard to "antibody (or serology tests" the "CDC does not recommend using [such] testing to diagnose current infection." CDC, *Overview of Testing for SARS-CoV-2, the virus that causes COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html#1 (last visited Sept. 14, 2022).

Plaintiff does not allege facts to support his conclusion that the use of nasal-swab testing for COVID-19 infection evidences a deliberate indifference to Plaintiff's health or safety.

**b.     N95 masks and alcohol-based sanitizer**

Plaintiff complains that Defendants failed to supply N95 masks despite the availability of 500,000,000 N95 masks and that Defendants failed to provide the most effective sanitizer, specifically alcohol-based sanitizer. This Court addressed virtually identical allegations in *Taylor v. Washington*, No. 2:20-cv-174, 2021 WL 959270 (W.D. Mich. Mar. 15, 2021).[8] The Court concluded that the allegations did not demonstrate that Defendants were deliberately indifferent to the COVID-19 risk:

> Moreover, Plaintiff's assertions that Defendants must provide him N95-type masks or soap containing specific ingredients appear misplaced. Perhaps Plaintiff labors under the false impression that outside the gates of KCF, the general public has access to, and often uses, N95 masks. That is not the case. Such masks remain scarce, even for healthcare workers. Indeed, the CDC explicitly directs that people "DO NOT choose masks that . . . [a]re intended for healthcare workers, including N95 respirators." CDC, Your Guide to Masks, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last visited Mar. 8, 2021). Instead, the CDC recommends washable cloth masks with two or more layers. *Id.* Additionally, the CDC advises using plain soap, not "antibacterial" soap, when washing hands. *See* CDC, *Show Me the Science – How to Wash Your Hands*, https://www.cdc.gov/handwashing/show-me-the-science-handwashing.html (last visited Mar. 8, 2021). The CDC advises that "studies have shown that there is no added health benefit for consumers (this does not include professionals in the healthcare setting) using soaps containing antibacterial ingredients compared with using plain soap." *Id.* The CDC further advises that washing hands with soap is favored over using alcohol-based hand sanitizers. *See* CDC, *When and How to Wash Your Hands*, https://www.cdc.gov/handwashing/when-how-handwashing.html (last visited Mar. 8, 2021). The CDC recommends cloth masks and plain soap, and Plaintiff alleges that these are what Defendants have provided.

*Taylor*, 2021 WL 959270, at *15 (footnote omitted).

---

[8] Indeed, Plaintiff's allegations so closely track the allegations in *Taylor* that it appears Plaintiff used the *Taylor* complaint as the source for virtually all of his allegations.

Plaintiff's allegations regarding the failure to provide N95 masks or alcohol-based sanitizer fail to support an inference that Defendants were, because of the failure, deliberately disregarding a substantial risk of serious harm. Accordingly, the Court concludes that the allegations fail to state an Eighth Amendment claim.

### 4.     Claims relating to the fall of 2020

Plaintiff's allegations jump forward in time from his initial test results during May of 2020 to events during the fall of 2020 when he was infected with the virus. (Compl., ECF No. 1, PageID.16–18, ¶¶ 65–75.) At the end of October 2020, Plaintiff alleges that the COVID-19 virus came into the prison one of two ways: (1) the school principal was ill yet continued to come into the facility; and (2) Brown allowed Marquette's sick prisoners to be housed in the visitor room. Thereafter, prisoners became ill. By November 11, several prisoners were so ill they had to be removed by paramedics. All of the KCF prisoners were again subjected to testing. Plaintiff tested negative. In an effort to isolate the positives from the negatives, on November 18, 2020, Plaintiff was moved into the gym with other negative prisoners.

Plaintiff reports that the gym had been previously occupied by positive prisoners. He alleges further that the port-a-potties in the gym were full of contaminated waste from positive prisoners. Five days later, Plaintiff tested positive. Plaintiff contends that he was infected by "splashing" from the port-a-potties. (*Id.*, PageID.17, ¶ 72.) Plaintiff notes that because he was infected he now needs blood pressure medications and has an unmanageable heart rate.

The entirety of Plaintiff's allegations regarding his placement in the gym appear at ¶¶ 69–73. Although Plaintiff alleges that Defendants Brown and Biggers had some role in moving Plaintiff to the gym, he does not allege that either Defendant knew that the port-a-potties had not been cleaned out, nor does he allege facts that support an inference that either Defendant was aware that the port-a-potties presented a serious risk of harm to Plaintiff.

To the contrary, in an attachment to the complaint, Plaintiff states that unnamed "Staff knew or should have known that the port-a-potties were full to capacity . . . ." (Dec. 8, 2020, Corr., ECF No. 1-13, PageID.74.) That is not enough. "[T]he official must at least have been aware of the specific risk of harm to the plaintiff that later develops." *Reynolds v. Szczesniak*, No. 21-2732, 2022 WL 3500191, at *4 (6th Cir. Aug. 18, 2022). Indeed, in *Doe v. Jackson Loc. Sch. Dist. Bd. of Ed.*, 954 F.3d 925 (6th Cir. 2020), the Sixth Circuit rejected a "should have known framework" because it "comes close to 'suggest[ing] a classic negligence formulation.'" *Id.* at 932. That formulation was expressly rejected in *Farmer*. *Farmer*, 511 U.S. at 838 ("But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").[9] Accordingly, the Court concludes that Plaintiff has failed to allege facts that support a claim that any Defendant was deliberately indifferent to a substantial risk of harm to Plaintiff when Plaintiff was moved to the gym.

## IV.    Plaintiff's specific claims (counts I–XI)

Plaintiff's separate counts do not generally allege violations of federal law. Each is addressed below.

### A.    Count I – state constitutional violations and statutory violations

In ¶¶ 93–100 of the complaint, Plaintiff alleges that Defendants violated a bevy of state constitutional violations and state statutes. Plaintiff also alleges, in ¶ 97, that Defendants violated Plaintiff's right to be free of cruel and unusual punishment. To the extent that Plaintiff intends to

---

[9] All nine justices, even Justice Thomas who concurred only in the judgment, agreed that "should have known" would not suffice to show deliberate indifference. *Farmer*, 511 U.S. at 860 (Thomas, J., concurring) ("[T]hat a prison official can be held liable for risks to prisoner safety of which he was ignorant but should have known—fails under even 'a straightforward application of *Estelle*.'").

state a § 1983 claim for a violation of the Eighth Amendment by way of that allegation, the claim is addressed above. With respect to every other allegation in Count I, however, claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Plaintiff's assertion that Defendants violated state law therefore fails to state a claim under § 1983.

To the extent that Plaintiff invites the Court to exercise its supplemental jurisdiction over state law claims for violation of state law, for the reasons stated in section V below, the Court declines to exercise supplemental jurisdiction.

### B. Count II – more state constitutional violations and common law "breach of duty" claims

In ¶¶ 101–104 of the complaint, Plaintiff alleges that Defendants violated five specific state statutes as well as "duties" to Plaintiff. Such state law violations are not actionable under § 1983. Moreover, for the reasons stated in section V below, the Court declines to exercise supplemental jurisdiction over such state law claims.

### C. Count III – unauthorized use of Plaintiff's health records

In ¶¶ 105–108 of the complaint, Plaintiff alleges that Defendants illegally authorized themselves to use his medical records. That authorization, he contends, violated state statutes, federal regulations, and 42 U.S.C. § 1395nn. With regard to any state statutory violations, they are not actionable under § 1983 and the Court will not exercise supplemental jurisdiction over state law claims based on the violations.

The statutory section that Plaintiff cites, and the regulations, are an interesting mish-mash of provisions that relate to the healthcare industry. For example, 42 C.F.R. § 2.51 regulates the

confidentiality of substance use disorder patient records. Plaintiff does not explain how the provision relates to his allegations and the Court cannot conceive of any possible connection. Any claim based on the regulation, therefore, is meritless.

Plaintiff also alleges that Defendants violated 45 C.F.R. § 164.502. That regulatory section was promulgated under the Health Insurance Portability and Accountability Act (HIPAA). But violations of HIPAA do not give rise to a private right of action either by implication under the act or through § 1983. *See, e.g.*, *Faber v. Ciox Health, LLC*, 944 F.3d 593, 596–97); *Adams v. Eureka Fire Prot. Dist.*, 352 F. App'x 137, 138–39 (8th Cir. 2009).

Finally, Plaintiff claims that Defendants violated 42 U.S.C. § 1395nn, commonly known as the Stark Law. *See, e.g.*, *United States ex rel Dorsa v. Miraca Life Scis., Inc.*, 33 F.4th 352, 354 (6th Cir. 2022). The United States District Court for the Eastern District of Michigan described the Stark law as follows:

> "The Stark Law was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest." *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012). The law broadly "prohibit[s] a physician who has a 'financial relationship' with an entity—such as a hospital—from making a 'referral' to that hospital for the furnishing of certain 'designated health services' for which payment otherwise may be made by the United States under the Medicare program." *Id.* (footnote omitted) (quoting 42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.353(a)).

*Concord EMS v. Oakwood Healthcare, Inc.,* No. 14-13012, 2015 WL 13036949, at *3 (E.D. Mich. Mar. 25, 2015). The Stark Law "'does not create its own right of action.'" *Id.* (quoting *United States ex rel Drakeford*, 675 F.3d at 396, and collecting district court cases from the Sixth Circuit). Moreover, whether or not there is a private right of action to enforce the Stark Law, Plaintiff fails to allege any facts to support a claim that Defendants have violated it.

For all of these reasons, Plaintiff has failed to state a federal claim in Count III.

D.     **Count IV-violations of state statutes by the healthcare corporate Defendants**

In ¶¶ 109–113 of the complaint, Plaintiff contends that certain Defendants violated a laundry list of state statutes by failing to fulfill their obligations as "health care corporations." Such state law violations are not actionable under § 1983. Moreover, for the reasons stated in section V below, the Court declines to exercise supplemental jurisdiction over such state law claims.

E.     **Count V-violations of state statute by illegally obtaining and possessing Plaintiff's DNA and making threats prior to testing**

In ¶¶ 114–116 of the complaint, Plaintiff claims that Defendants breached duties and violated a state statute when they ordered others to threaten or threatened Plaintiff to illegally obtain his DNA. Plaintiff claims that the laboratory Defendants illegally used Plaintiff's DNA. Such state law violations are not actionable under § 1983. Moreover, for the reasons stated in section V below, the Court declines to exercise supplemental jurisdiction over such state law claims.

F.     **Count VI, VII, and VIII-violations of HIPAA, the Stark Law, related regulations, and state statutes by illegally profiting from Plaintiff's health**

In ¶¶ 117–124 of the complaint, Plaintiff alleges that Defendants illegally profited from Plaintiff's health, breached duties by abusing Plaintiff's funds through Medicaid, fabricated Plaintiff's health documents, and inflicted the virus on Plaintiff in violation of HIPAA, the Stark Law, and state statutes. Plaintiff's claims are properly dismissed for the reasons stated in section IV.C, above.

G.     **Count IX and X-breach of duties in violation of state statutes and MDOC policy directives**

In ¶¶ 125–128 of the complaint, Plaintiff alleges that Defendants breached duties under state statutes and MDOC policy directives. Such state law violations are not actionable under § 1983. Moreover, for the reasons stated in section V below, the Court declines to exercise supplemental jurisdiction over such state law claims.

### H.    Count XI-conspiracy to take all of the wrongful actions alleged in Plaintiff's complaint

In ¶¶ 129–135, Plaintiff alleges that Defendants conspired to commit all of the wrongs alleged in the rest of the complaint. To the extent Plaintiff claims that Defendants conspired to violate state law or that the conspiracies gave rises to claims under state law, such state law violations are not actionable under § 1983. Moreover, for the reasons stated in section V below, the Court declines to exercise supplemental jurisdiction over such state law claims.

To the extent that Plaintiff alleges a conspiracy to violate his federal rights, that is actionable under § 1983 or § 1985. A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations of conspiracy are wholly conclusory. He alleges no facts that indicate the existence of a plan, much less that any Defendant shared a conspiratorial objective. Instead, Plaintiff's allegations, even viewed in the light most favorable to Plaintiff, describe a number of discrete occurrences over a period of time involving numerous individual prison staff or non-prison

34

personnel who participated in providing healthcare services to Plaintiff. He appears to rely entirely on a highly attenuated inference from the mere fact that Defendants subjected him to objectionable treatment by a variety of prison officials or others in various circumstances. As the Supreme Court has held, such allegations, while hinting at a sheer "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556–57. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567). In light of the far more likely possibility that the various incidents occurring over the first year of the pandemic were unrelated, Plaintiff fails to state a plausible claim of conspiracy.

To maintain a cause of action for conspiracy under 42 U.S.C. § 1985(3),[10] a plaintiff must establish the following four elements: (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *See Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)); *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998).

---

[10] Subsections (1) and (2) of § 1985 do not apply. Subsection (1) is inapplicable because Plaintiff does not allege a conspiracy to interfere with federal officers in the performance of their duties. *See* 42 U.S.C. § 1985(1). The first clause of subsection (2) is also inapplicable because Plaintiff does not allege that Defendants conspired to influence parties, witnesses, or jurors in federal court proceedings. *See* 42 U.S.C. § 1985(2). In addition, the second clause of subsection (2) is inapplicable because Plaintiff does not allege that Defendants conspired to "interfere with due process in state courts with the intent to deprive persons of their equal protection rights." *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006).

Plaintiff does not make any viable allegation that Defendants deprived him of equal protection under the laws. Accordingly, he has failed to state a claim under 42 U.S.C. § 1985.

## V. Supplemental jurisdiction

Plaintiff invites the Court to exercise supplemental jurisdiction over many state-law claims. The Court declines to exercise jurisdiction.

Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings, Inc. v. Farris* 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotation marks omitted)). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims will be dismissed without prejudice.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons the Court concludes that Plaintiff's claims are properly dismissed, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Plaintiff's sprawling complaint rambles far afield from the core Eighth Amendment COVID-19 claims and names a slew of Defendants simply because they are executives in MDOC Central Facilities Administration or played some role in testing for COVID-19 infection, not because they took any particular action that impacted Plaintiff. Plaintiff's allegations relating to the conditions at KCF in the early days of the pandemic are groundless and his allegations regarding the outbreak during the fall of 2020 do not come close to alleging deliberate indifference by the named Defendants. For all of these reasons, the Court certifies that an appeal would not be taken in good faith.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated: October 3, 2022

/s/ *Maarten Vermaat*
Maarten Vermaat
United States Magistrate Judge